UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

MIRYAM ALLAM a/k/a MIRYAM MEYERS,                    09 Civ. 10580 (PAC)

                              Plaintiff,

                    -against-                        **FIRST AMENDED**
                                                     **COMPLAINT**
JASON MEYERS,
                                                     **Jury Trial Demanded**
                              Defendant.

------------------------------------------------------------------X


        Plaintiff, complaining of the defendant, by her attorneys, THE BERKMAN

LAW OFFICE, LLC, alleges for her complaint as follows:


                              **THE PARTIES**

        1.      At all times mentioned herein, the plaintiff, MIRYAM ALLAM

a/k/a MIRYAM MEYERS ("MIRYAM"), is a citizen of France.

        2.      The plaintiff MIRYAM is a young woman from France with no

connections whatsoever in the United States and no assets of any significance. Before

she met the defendant she worked as an administrative assistant and as a hostess at an

event facility.

        3.      At all times mentioned herein, the defendant, JASON MEYERS

("JASON"), is a citizen of the State of New York.

        4.      Upon information and belief, the defendant JASON is an officer

and/or director of several publicly traded corporations, including, upon information

and belief, serving as Chairman and CEO of Aspatuck Holdings Ltd., a New York-

based private equity firm that he founded in 2002 to specialize in corporate restructurings as well as provide capital for emerging growth companies; Managing Director of ICM Capital Markets Ltd.; Chairman of Turbodyne Technologies, Inc. (TRBD-OTC); and CEO of TriMedia Entertainment Group, Inc. (TMEG-OTC), has assets and owns property worth in the millions of dollars, and has unfettered access to legal and other advisors.

5.    Indeed, upon information and belief, the defendant JASON shares several children, and maintains close relations, with his own ex-wife, who is a prominent divorce attorney in Suffolk County, NATASHA MEYERS (www.bestnewyorkdivorce.com).

## JURISDICTION AND VENUE

6.    This Court has jurisdiction over this matter pursuant to 28 USC § 1332 as the plaintiff is a citizen of France and the defendant is a citizen of New York State, and the amount in controversy exceeds $75,000.

7.    Venue is properly placed in the United States District Court for the Southern District of New York since a substantial part of the events or omissions giving rise to the claim occurred in this District.

## THE UNDERLYING FACTS

8.    The plaintiff MIRYAM met the defendant JASON at a reception in Geneva in December 2007.

9.    In March 2008, MIRYAM came to visit New York for a few days.

10.    During that visit to New York, MIRYAM and JASON spent much time together, going to restaurants, Central Park, etc.

11.    After MIRYAM returned to France, JASON and MIRYAM talked by phone multiple times every day and night.

12.    In the summer of 2008, JASON and MIRYAM met in Montreux, Switzerland, and spent a full week together.

13.    Two months later, JASON suggested that the parties meet in Frankfurt, Germany where he had a business meeting.

14.    The parties met in Frankfurt, as JASON had proposed, and after his meeting in Frankfurt they traveled together by car to Prague, Czech Republic.

15.    MIRYAM believed the time spent together in Frankfurt and Prague was extremely romantic, and that the parties were very much in love.

16.    Several weeks after the Frankfurt – Prague trip, JASON came to visit MIRYAM in Geneva, Switzerland.

17.    As before, MIRYAM believed the time they spent together in Geneva to have been very romantic and that the parties were in love.

18.    On or about November 5, 2008, JASON sent MIRYAM an airplane ticket by email. JASON told MIRYAM that he could not live without her and that he was her Prince Charming.

19.    MIRYAM travelled to New York City to be with JASON on or about November 6, 2008.

20.    During that visit, MIRYAM spent three weeks in New York, and then returned to Europe.

21.    Upon her return to Europe, MIRYAM missed JASON terribly, and JASON said he missed her.

22.    MIRYAM returned to New York on or about November 30, 2008, and stayed until sometime after Christmas.

23.    During Christmas, JASON introduced MIRYAM to his ex-wife, NATASHA MEYERS, and his children as a friend's cousin.

24.    Feeling that it was too much too soon, and needing to tend to her apartment and to return to her life, MIRYAM returned to Europe.

25.    JASON again sent MIRYAM an airplane ticket and she came to New York again on or about January 19, 2009.

26.    During this visit, JASON told his children that MIRYAM was his girlfriend.

27.    During this visit, the parties would spend the weekdays together at JASON's apartment in Manhattan, and on weekends JASON would go to a house he owned in Long Island for visitation with his children, telling MIRYAM that it was not a good idea for her to be there with his children.

28.    During this visit, MIRYAM took some English lessons at the American Language Communication Center ("ALCC").

29.    In early March 2009, MIRYAM returned to Europe.

30.     On or about April 12, 2009, at JASON's insistence, MIRYAM returned to New York.

31.     Starting in or about May 2009, JASON started to be nasty to MIRYAM.

32.     When MIRYAM brought up that the parties never spent the weekend together, JASON became very upset and slapped MIRYAM.

33.     After being slapped, MIRYAM became very upset and wanted to leave, but JASON apologized and promised it would be the last time.

34.     At this point, with all the travelling and having been away from her home in Europe where she had been working, MIRYAM had used up all her money.

35.     JASON began giving MIRYAM $10 - $20 dollars per day.

36.     MIRYAM used some of the money JASON gave her to go to the supermarket and buy food, and she began to cook dinner almost every night.

37.     JASON would sometimes become enraged and throw the food MIRYAM had prepared on the floor.

38.     MIRYAM began to take English lessons again.

39.     JASON became enraged that MIRYAM was taking English lessons, and told her that she should stay in their apartment and learn English over the computer.

40.     Later, when MIRYAM said that she wanted to go back to taking English lessons, JASON became enraged and slapped her.

41.    Despite JASON's physical and psychological abuse, MIRYAM found it difficult to leave JASON because she felt that she loved him and that he was going to change.

42.    One day MIRYAM met a woman named Celeste in front of the parties' Manhattan apartment building. Celeste was 38 years old and single. Celeste spoke some French, and MIRYAM was happy to have a friend.

43.    When MIRYAM told JASON about Celeste, JASON became enraged. JASON told MIRYAM that Celeste was crazy because she was 38 years old and not married, and said that all women in New York City became crazy after 30.

44.    JASON forbade MIRYAM from seeing Celeste.

45.    After the Celeste episode, JASON told MIRYAM that he and only he would find friends for MIRYAM.

46.    Despite JASON's physical and psychological abuse, MIRYAM found it difficult to leave JASON because she felt that she loved him and that he was going to change.

47.    In early July 2009 JASON proposed that MIRYAM marry him. JASON made the proposal at a restaurant in the Boathouse in Central Park, in Manhattan. It was a public proposal with all the patrons of the restaurant watching and waiting to hear the answer.

48.    Despite having intended to return to Europe to start a new job, MIRYAM felt pressured and said yes. MIRYAM told herself that love was more important than a career, and that JASON was going to change after they were married.

49.    After becoming engaged, JASON began to beat MIRYAM regularly for all manner of purported reasons, including, among other things that: he did not like what she had made for dinner; she forgot to wash some item of laundry; he did not like her outfit; he did not like her makeup; and he did not approve of MIRYAM calling her mother.

50.    Despite JASON's physical and psychological abuse, MIRYAM found it difficult to leave JASON because she felt that she loved him and that he was going to change.

51.    In or about early June 2009 MIRYAM became pregnant with JASON's child.

52.    After MIRYAM performed the pregnancy test and told JASON that she was pregnant, JASON'S reaction was to laugh and say "now you are mine."

53.    MIRYAM was scared and appalled at JASON's reaction to her pregnancy, but believed he would change once they were married and had a child together.

54.    Despite JASON's physical and psychological abuse, MIRYAM found it difficult to leave JASON because she felt that she loved him and that he was going to change.

55.    Despite the fact that MIRYAM was pregnant, JASON continued to subject her to physical violence such as pushing and shoving her.

56.    After MIRYAM became pregnant, JASON would often humiliate the plaintiff in public, for example calling her nasty names in front of other people.

57.    JASON would sometimes leave MIRYAM at a table in a restaurant after they had finished eating—without money, without her knowing the way back to their apartment, and, upon information and belief, deliberately not answering his cell phone when she would try to call him.

58.    Despite JASON's physical and psychological abuse, MIRYAM found it difficult to leave JASON because she felt that she loved him and that he was going to change.

59.    One time JASON humiliated MIRYAM by slapping her and pulling her hair on the street in public, and asked her to slap him too. When MIRYAM refused to involve herself in violence, JASON left her alone in the street.

60.    When MIRYAM returned to the parties' apartment, JASON apologized and said that he wanted to see a psychologist. JASON told MIRYAM that it was exciting for him to see MIRYAM upset and that seeing her upset turned him on.

61.    Despite JASON's physical and psychological abuse, MIRYAM found it difficult to leave JASON because she felt that she loved him and that he was going to change.

62.    Another time shortly thereafter when the parties were out together, JASON slapped MIRYAM because she wanted to see a movie in a theatre. MIRYAM cried and asked JASON why he treated her like a dog. His response was to tell MIRYAM "don't act like a dog if you don't want to be treated like a dog." MIRYAM sat on a stoop and cried. JASON left her there crying and took a taxi home.

63.    Upon information and belief, JASON knew that because she was pregnant and in a foreign country MIRYAM had no choice but to come back to him no matter how abusive he was.

64.    When MIRYAM returned to the parties' apartment, JASON apologized again.

65.    MIRYAM began to realize that JASON felt a need to humiliate and control her, but she believed he was a good person and would change.

66.    Despite JASON's physical and psychological abuse, MIRYAM found it difficult to leave JASON because she felt that she loved him and that he was going to change.

67.    JASON began to demand that MIRYAM submit to having anal sex with him, which she did not want to do.

68.    JASON would watch pornographic movies in front of MIRYAM which greatly terrified her; she would lock herself in the bathroom until she heard JASON leave the house. When he would return home he would want to have sex with MIRYAM but she would be afraid of him.

69.    JASON would try to persuade MIRYAM to submit to his sexual demands by suggesting that she drink alcoholic beverages that he had in the apartment despite claiming to have been a member of Alcoholics Anonymous for 17 years.

70.    One time when the parties did engage in sexual intercourse, JASON demanded that MIRYAM tell him that she was his "slave" and that he was "the

most powerful man in the world." After MIRYAM refused this demand, JASON called her a "bitch" and ejaculated on her face.

71.    After MIRYAM began to cry terribly, JASON tried to explain away his behavior as having been a "role game."

72.    The next day, MIRYAM was afraid of JASON and in terrible pain. She told JASON that she wanted to call off the engagement and return to Europe to see her mother.

73.    JASON told MIRYAM that if she would go to the airport and try to leave the United States she would be arrested because her tourist visa had expired.

74.    MIRYAM did not know what to do; she was afraid of being arrested and held in jail with her baby. She felt trapped by JASON.

75.    MIRYAM asked JASON to tell his ex-wife and children that they were engaged to be married. JASON became furious. MIRYAM asked if he was afraid of his ex-wife's reaction. JASON became further enraged. He pulled MIRYAM's hair, kicked her, and pushed her repeatedly against his car. He shrieked at her "don't ever say that I am afraid of anyone. Never."

76.    When JASON pushed MIRYAM against the car, she felt a clicking in her neck, which developed into severe pain, requiring her to seek treatment from a chiropractor and at the Lenox Hill Hospital Emergency Room in Manhattan, among other treatment.

77.    Despite being terrified of JASON after this abuse, MIRYAM felt she was trapped and had no choice but to go home with him. MIRYAM hoped that once the

baby was born and they were married, JASON and MIRYAM, their child, and his other children would be able to form a happy family.

78.    Thereafter, MIRYAM underwent an ultrasound examination of the baby. JASON came with MIRYAM for the examination. JASON became enraged when the technician asked JASON to wait in the waiting room. After the ultrasound was completed for clinical purposes, the technician invited JASON in to see the baby and hear the heartbeat, and JASON seemed to be happy.

79.    When they left the office where the ultrasound had been performed, JASON became enraged again. JASON tried to burn MIRYAM's arm with a cigar he was smoking. He irrationally said "you are not going to be like her." MIRYAM did not understand this comment.

80.    After they arrived home, JASON tried to explain his behavior. He stated that his oldest child did not look like him, and that he was sure that his oldest child was not his biological child because his ex-wife had gone out and did not sleep at home, and he was therefore sure that she had cheated on him.

81.    Thereafter, when MIRYAM was folding and putting away laundry, she found a picture of JASON and his ex-wife. In the picture his ex-wife was wearing a very short black leather dress and holding a whip, and JASON had a mask with metal chains around his body.

82.    MIRYAM asked JASON about the picture she had found. He slapped her and ordered her never to touch it again.

-11-

83.     MIRYAM asked JASON to resume going to his Alcoholics Anonymous meetings. He went to a psychologist for a short period thereafter.

84.     Once again MIRYAM wanted to go to Europe to see her mother. JASON told her again that she would be arrested if she tried to leave the country.

85.     On July 25, 2009 MIRYAM suffered a miscarriage.

86.     On August 13, 2009, MIRYAM's friend Celeste proposed that they have dinner together. MIRYAM called JASON and he said he would be coming home late.

87.     When MIRYAM returned from dinner with Celeste to the parties' apartment at 200 East 61st Street in Manhattan, the concierge of the apartment building would not let MIRYAM into the building; he said that JASON had directed that MIRYAM not be permitted to enter.

88.     The concierge brought MIRYAM to the basement, where she saw that all her clothes and belongings had been dumped in garbage bags.

89.     JASON came down to the basement and would not let MIRYAM take her clothes and belongings.

90.     MIRYAM tried to leave the building but JASON followed her, pulling her hair.

91.     MIRYAM tried to call the police but JASON grabbed her phone. JASON told MIRYAM that he would never leave her in peace in this country, and that he would kill her.

92.     MIYRAM ran from him and jumped into a taxi. JASON chased her and tried to pull her out of the taxi.

93.     MIRYAM went in the taxi to Celeste's house, from where they called the police. When the police arrived, they went back to JASON's basement and retrieved MIRYAM's clothes and passport.

94.     After this episode, MIRYAM stayed with Celeste for about a week. JASON texted her apologies and an explanation that he purportedly loved her so much that he was jealous when he thought she was out with someone else.

95.     Several days later, JASON was in a bad mood one morning. He told MIRYAM not to speak or he would do the same things he had done in the past.

96.      Several days later, the parties were walking in the street in Manhattan. A man said something to MIRYAM while walking past. JASON accused MIRYAM, telling her it was her fault that the man had said something to her in the street, and hit her. JASON aggressively removed a ring from MIRYAM's finger and bit her hand.

97.     Some time later, MIRYAM told JASON that she felt he was torturing her and asked why he treated her this way. JASON's response was to say that even if he were to have sex with five women in front of MIRYAM it "would not be enough." MIRYAM understood this to mean that JASON thought she deserved to be subjected to such torture.

98.     One day JASON slapped MIRYAM because she had forgotten to close the bathroom door and JASON felt a draft due to a broken window in the bathroom.

99.     Throughout this entire period, MIRYAM knew she needed help, but did not know who she could call. She felt trapped.

100.    Despite JASON's physical and psychological abuse, MIRYAM found it difficult to leave JASON because she felt that she loved him and that he was going to change.

101.    Several days after JASON's comment about having sex with five women, JASON apologized to MIRYAM, and told her that he did not want to be like "those men who treat a lady like a whore and a whore like a lady." MIRYAM asked JASON what he meant by that, but all he could say was that it was a "proverb."

102.    The parties got married at City Hall in Manhattan on October 2, 2009.

103.    MIRYAM hoped desperately that by her marrying JASON his behavior would change.

104.    MIRYAM asked JASON why he did not invite his friends or family to the wedding. JASON promised he would make a reception in April.

105.    On October 16, 2009, the parties were at JASON's house in Long Island. They went out for dinner. JASON insisted on going to a club, although MIRYAM did not want to. MIRYAM felt sick and went to the bathroom.

106.    When MIRYAM returned from the bathroom, JASON was angry and accused MIRYAM of having been gone for too long and of having gone to look for other men. JASON grabbed MIRYAM's arm and told her "you will see at home." MIRYAM was terrified.

107.    As they left, JASON tried to hit MIRYAM. MIRYAM ran away from JASON and he left in his car.

108.    MIRYAM was scared to go home, but she had nowhere else to go.

109.    MIRYAM took a taxi but the driver got lost and it took a long time for MIRYAM to get back to the house.

110.    MIRYAM did not have a key with her.

111.    MIRYAM tried to enter the house through a bathroom window on the side of the house that was already broken. JASON was already in the house and came to the bathroom.

112.    JASON was enraged and screamed at MIRYAM, calling her a "whore."

113.    JASON picked up pieces of broken class from the window and threw them at MIRYAM. MIRYAM was injured and bleeding from her head.

114.    JASON grabbed MIRYAM and violently pulled her in the window, scraping her body on the broken glass in the window frame.

115.    As JASON yanked MIRYAM into the bathroom, she fell off the windowsill and onto the toilet, injuring her back.

116.    As MIRYAM lay on the floor, with blood streaming down her face, JASON pulled her hair, punched her in the stomach, kicked her with his feet, and threatened to kill her. MIRYAM was terrified.

117.    JASON pulled her into the shower by her hair, turned on the cold water, and held the door shut.

118.    JASON then ran out to the living room and picked up a hammer. Meanwhile, MIRYAM called the police.

119.    MIRYAM was taken by ambulance to the hospital.

120.    JASON was arrested.

121.    After being treated for her injuries, the police drove MIRYAM home.

122.    JASON's ex-wife came and took pictures of the glass and blood in the bathroom.

123.    About one hour later, JASON's ex-wife returned to the house together with her current husband, DANIEL BAKER. They entered using a key that they had.

124.    JASON's ex-wife told MIRYAM that she and her husband were allowed to be there because her husband was JASON's lawyer.

125.    JASON's ex-wife and her husband took various items from the house, including car keys.

126.    MIRYAM was terrified of JASON's ex-wife and her husband, and wanted to get out of the house and go to the police. However she was trapped in the house because it was in a secluded area not close to town.

127.    MIRYAM called a taxi to go to town, and asked to stop at a bank.

128.    When MIRYAM attempted to withdraw money from her bank account, she saw that while she had been at the hospital JASON had transferred all the money that had been in her account to his account, leaving her with only $25.

129.    The following day a woman came to the Long Island house seemingly to deliver flowers, but turned out to be a process server serving MIRYAM with as summons and complaint for divorce.

130.    In that summons and complaint, JASON continued his abuse of MIRYAM, accusing her again of being a prostitute, of rampant promiscuity, of being a drunk, and of all manner of lewdness and lasciviousness.

131.    The summons and complaint was dated October 18, 2009, and was notarized by JASON's ex-wife, whose law firm, The Meyers Law Group, P.C., is representing JASON in his action for divorce.

132.    Upon information and belief, JASON's ex-wife's law firm specializes in divorce cases; its website is www.bestnewyorkdivorce.com.

133.    After being served with divorce papers, MIRYAM took her belongings and put them in storage and found a room she could rent on a short-term basis with money her mother transferred to her by Western Union.

-17-

134.    Several days later, MIRYAM received an email from an immigration enforcement officer wanting her to come to his office with her passport to be deported.

135.    Upon receiving that email, MIRYAM called the immigration lawyer whom she had gone to with JASON to obtain her green card that she had been entitled to as the wife of a US citizen. The immigration lawyer told her that JASON had forbidden her from performing any more work for MIRYAM, and that JASON wanted MIRYAM to leave the country immediately.

136.    There is no way that the immigration officer could have found out MIRYAM's email address other than from JASON, either directly or via one of JASON's attorneys.

137.    Upon information and belief, JASON attempted to orchestrate MIRYAM's being deported from the United States in order to prevent MIRYAM from being able to testify against him at the trial of the criminal charges pending against him relating to the events of October 16, 2009 for which JASON had been arrested.

138.    As a result of the defendant's conduct as aforesaid, the plaintiff was caused to suffer the following serious and permanent personal injuries: scars and lacerations; back injury, including suspected herniated or bulging disc(s) with nerve root impingement; severe emotional distress and trauma; humiliation; and plaintiff has been otherwise injured.

## AS AND FOR A FIRST CLAIM FOR RELIEF

139.    Plaintiff repeats and re-alleges each of the foregoing allegations with the same force and effect as if more fully set forth herein.

140.    The defendant committed a series of batteries of the plaintiff's person, including hitting her, kicking her, pulling her hair, grabbing her, pushing her, throwing glass on her, pulling her in a window, pulling her off a windowsill and allowing her body to crash down onto a toilet, imprisoning her, ejaculating on her face, running cold shower water on her while imprisoning her in the shower, and otherwise physically assaulting her as alleged herein.

141.    None of the aforementioned conduct was authorized or invited by the plaintiff.

142.    As a result of the defendant's batteries and offensive touching of the plaintiff, the plaintiff was caused to suffer serious and permanent personal injuries, as alleged above.

143.    The defendant's conduct was outrageous and violates all standards of human decency, and requires that punitive damages be awarded.

144.    By reason of the foregoing, the plaintiff is entitled to recover the full extent of her damages, including punitive damages, in an amount to be determined by the jury at trial.

## AS AND FOR A SECOND CLAIM FOR RELIEF

145.    Plaintiff repeats and re-alleges each of the foregoing allegations with the same force and effect as if more fully set forth herein.

146.    The defendant by the conduct alleged herein repeatedly placed the plaintiff in fear of imminent bodily harm.

147.    None of the aforementioned conduct was authorized or invited by the plaintiff.

148.    As a result of the defendant's conduct, the plaintiff was caused to suffer serious and permanent personal injuries, as alleged above.

149.    The defendant's conduct was outrageous and violates all standards of human decency, and requires that punitive damages be awarded.

150.    By reason of the foregoing, the plaintiff is entitled to recover the full extent of her damages, including such punitive damages as may be allowed by law, in an amount to be determined by the jury at trial.

## AS AND FOR A THIRD CLAIM FOR RELIEF

151.    Plaintiff repeats and re-alleges each of the foregoing allegations with the same force and effect as if more fully set forth herein.

152.    The defendant's conduct as alleged herein constituted extreme and outrageous conduct.

153.    Upon information and belief, the defendant intended to cause the plaintiff to suffer severe emotional distress.

154.    Upon information and belief, the defendant disregarded the substantial probability of causing the plaintiff to suffer severe emotional distress.

155.    As a result of the defendant's conduct, the plaintiff was caused to suffer serious and permanent personal injuries, as alleged above.

156.    The defendant's conduct was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community.

157.    By reason of the foregoing, the plaintiff is entitled to recover the full extent of her damages, including such punitive damages as may be allowed by law, in an amount to be determined by the jury at trial.

## AS AND FOR A FOURTH CLAIM FOR RELIEF

158.    Plaintiff repeats and re-alleges each of the foregoing allegations with the same force and effect as if more fully set forth herein.

159.    As alleged above, the defendant falsely imprisoned the plaintiff by, among other things, confining her to the bathroom, confining her to the shower, and falsely telling her that she would be arrested if she tried to leave the country.

160.    As a result of the defendant's conduct, the plaintiff was caused to suffer serious and permanent personal injuries, as alleged above.

161.    The defendant's conduct was outrageous and violates all standards of human decency, and requires that punitive damages be awarded.

162.    By reason of the foregoing, the plaintiff is entitled to recover the full extent of her damages, including such punitive damages as may be allowed by law, in an amount to be determined by the jury at trial.

## AS AND FOR A FIFTH CLAIM FOR RELIEF

163.    Plaintiff repeats and re-alleges each of the foregoing allegations with the same force and effect as if more fully set forth herein.

164.    The defendant took a ring from the plaintiff, as alleged hereinabove.

165.    The ring was the plaintiff's property.

166.    Upon information and belief, the defendant sold the ring and used the proceeds for his own personal debts.

167.    The issue of plaintiff's entitlement to compensation for the ring was explicitly excluded from the parties' settlement of their matrimonial proceeding.

168.    By reason of the foregoing, the plaintiff is entitled to recover the full extent of her damages, including such punitive damages as may be allowed by law, in an amount to be determined by the jury at trial.

**WHEREFORE**, the plaintiff demands judgment against the defendant in the amounts and for the relief requested herein, plus attorney's fees to the extent permitted by law.

Dated:   New York, New York
         March 17, 2010

                              Yours,

                              THE BERKMAN LAW OFFICE, LLC
                              *Attorneys for the Plaintiff*


                              by:   S/*Robert J. Tolchin*
                                    Robert J. Tolchin
                                    Daniel Shimko

                              111 Livingston Street, Suite 1928
                              Brooklyn, New York 11201
                              718-855-3627