**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------
MIRYAM ALLAM a/k/a MIRYAM MEYERS,

                 Plaintiff,

         - against -                    09 C 10580 (MEA)
                                            <u>MEMORANDUM OPINION AND</u>
                                            <u>ORDER</u>

JASON MEYERS,

                 Defendant.
-------------------------------------------------------------

**MARVIN E. ASPEN**, United States District Judge:

      Presently before us is Defendant Jason Meyers' renewed motion for judgment as a matter

of law or, alternatively, motion for a new trial.  Meyers asks that we dismiss the jury verdict

entered against him at the conclusion of trial on April 19, 2012.  Failing that, Meyers seeks a new

trial, or at least reduction of the $500,000 in total damages awarded to Plaintiff Miryam Allam,

his ex-wife.  As discussed below, the motion is granted in part, and denied in part.

## BACKGROUND

      Although we assume familiarity with the underlying facts of this case, we briefly recount

the details pertinent to the pending motion.  Allam, a French citizen, and Meyers, an American,

met at an event in Geneva, Switzerland in December 2007 and began a long-distance romantic

relationship.  (Trial Tr. at 43–45.)  Allam briefly visited Meyers in New York in early 2008, and

they met again in Switzerland that summer.  (*Id.* at 46–50.)  They spent additional time together

in Prague and in Switzerland.  (*Id.* at 50.)  Between November 2008 and April 2009, Allam

visited and stayed with Meyers in New York several times.  (*Id.* at 53, 96, 99–100.)  In April

2009, Allam returned to Europe for approximately one week, during which she tied up her affairs

and prepared to move to New York more permanently to be with Meyers.  (*Id.* at 103–05.)
Meyers and Allam got engaged in early July 2009.

　　　According to Allam, Meyers became jealous, controlling, and violent throughout their
courtship and brief marriage.  Among other things, he forbade Allam from continuing English
language classes and socializing with a female friend.  (*Id.* at 103, 106–07.)  Allam testified that
this volatile behavior continued even when they learned she was pregnant in the summer of
2009.[1]  She testified that Meyers struck and hurt her on at least seven different occasions after
their engagement and prior to the events of October 16–17, 2009.  (*Id.* at 109, 113–15, 117,
119–20, 187–88.)  In July 2009, for example, Meyers pushed her, then pulled her hair and shoved
her into his parked car.  (*Id.* at 109–10.)  As a result, she went to the hospital at some point later
for extreme neck pain and began seeing a chiropractor.  (*Id.*)  On another occasion, he grabbed
and shook her, pulled her hair, and threatened to kill her.  (*Id.* at 114–15.)  Allam also testified to
verbal abuse by Meyers, including one incident where, after he demeaned her, she attempted
suicide by taking an entire bottle of Tylenol.  (*Id.* at 117, 120–22.)

　　　Despite the above, Allam and Meyers married at City Hall on October 2, 2009.  (*Id.* at
123, 125.)  On October 16, 2009, they went out for dinner and then to a lounge.  (*Id.* at 127–29.)
Later that evening, Meyers became angry and accused Allam of speaking to another man.  (*Id.* at
129.)  He shook her, grabbed her arm, and pulled her outside.  He then hit her and left.  (*Id.*)
After crying and waiting for some time, Allam took a cab back to the house, where Meyers
denied her entrance.  (*Id.* at 131–33.)  Allam then decided to climb in a bathroom window she
knew to be broken.  (*Id.* at 133-34.)  According to Allam, Meyers attacked her as she made her

---

[1] Allam suffered a miscarriage in late July of 2009.  (Trial Tr. at 116.)

way through the open, broken window.  (*Id.* at 132–39.)  Meyers smashed the glass with a

hammer, which rained upon her, and yanked her through the broken window.  She fell down to

the floor, where Meyers began shaking, kicking, and punching her.  (*Id.* at 137.)  He hit her

stomach and head, and made derogatory comments.  He then put her in the shower and ran cold

water before leaving the room.  (*Id.* at 138.)  Allam testified that she thought Meyers was going

to kill her during the beating.  (*Id.*)  Both parties called 911 on the morning of October 17, 2009

to report this incident.  Allam was taken to the hospital with cuts to her face and legs, and Meyers

was arrested.  (*Id.* at 144.)  Allam was served with divorce papers the next business day, and the

parties' marriage was later annulled.  (*Id.* at 148–49.)  As of the civil trial conducted in April

2012, the criminal proceedings against Meyers remained pending.

Meyers testified very briefly at trial[2] and denied ever hitting, restraining, or otherwise

abusing Allam.  (*Id.* at 228–29.)  Nonetheless, the jury found in Allam's favor on all three claims

tried: assault, battery, and intentional infliction of emotional distress ("IIED").  The jury awarded

Allam $200,000 for pain and suffering, as well as $300,000 in punitive damages.  The verdict

sheet, as agreed upon by the parties, did not call for the jury to allocate any damage awards

among the three claims.  (*Id.* at 234; *see* Dkt. No. 52 (Judgment and Jury Verdict).)

## ANALYSIS

## I.   Motion for Judgment as a Matter of Law

Pursuant to Federal Rule of Civil Procedure 50, we may direct judgment as a matter of

law ("JMOL") or order a new trial "if a jury returns a verdict for which there is not a legally

---

[2] Indeed, Meyers' direct examination included eleven questions and lasted approximately five
minutes.  Cross-examination was similarly and necessarily limited.  (*See* Trial Tr. at 227–30.)

sufficient basis." *This Is Me, Inc. v. Taylor*, 157 F.3d 139, 142 (2d Cir. 1998); *Tepperwien v. Entergy Nuclear Ops., Inc.*, No. 07 C 433, 2010 WL 8938797, at *1 (S.D.N.Y. Mar. 16, 2010); *Fioto v. Manhattan Woods Golf Enters., LLC*, 270 F. Supp. 2d 401, 403 (S.D.N.Y. 2003).  In evaluating a motion under Rule 50(b), we are "required to consider the evidence in the light most favorable to the [non-moving party] . . . and to give that party the benefit of all reasonable inferences that the jury might have drawn in [her] favor from the evidence." *United States v. Landau*, 155 F.3d 93, 100 (2d Cir. 1998) (quoting *Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 367 (2d Cir. 1988)); *Gatti v. Cmty. Action Agency of Greene Cty., Inc.*, 263 F. Supp. 2d 496, 503 (N.D.N.Y. 2003).  We may not "assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute [our] judgment for that of the jury."  *Gatti*, 263 F. Supp. 2d at 503 (internal quotation omitted); *Tepperwien*, 2010 WL 8938797, at *1.  Indeed, we must not disturb a jury's verdict unless "(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [people] could not arrive" at the verdict reached.  *Gatti*, 263 F. Supp. 2d at 503 (internal quotation omitted); *Tepperwien*, 2010 WL 8938797, at *1; *see Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 127–28 (2d Cir. 2012).

The moving party bears the burden of proving that either JMOL or a new trial is warranted.  *Cross v. New York City Transit Auth.*, 417 F.3d 241, 248 (2d Cir. 2005) (noting that the moving party's burden on a Rule 50 motion "is particularly heavy after the jury has deliberated in the case and actually returned its verdict"); *Giles v. Rhodes*, 171 F. Supp. 2d 220, 225 (S.D.N.Y. 2001) (explaining that the movant bears the burden on a motion for a new trial);

*see Mendez v. Starwood Hotels & Resorts Worldwide, Inc.*, 746 F. Supp. 2d 575, 594, 604 (S.D.N.Y. 2010).

### A.    Assault and Battery Claims

While Meyers attacks the jury's verdict on the IIED claim on multiple grounds in his motion for JMOL, he does not explicitly ask us to upend the jury's finding of liability for assault and battery.[3]  (Mem. at 3–5; Reply at 1, 3.)  Rather, his arguments focus on the jury's damages awards.  (Mem. at 2–4; Reply at 4–9.)  Meyers' request for a reduction in the amount of damages "come[s] under the umbrella of Rule 59."  *Hill v. Airborne Freight Corp.*, 212 F. Supp. 2d 59, 64–65 (E.D.N.Y. 2002); *see also In re Fosamax Prods. Liability Litig.*, 742 F. Supp. 2d 460, 484–85 (S.D.N.Y. 2010) (describing our role when evaluating a request for new trial or remittitur under Rule 59).  Accordingly, we will address the request for remittitur later, when considering Meyers' alternative motion for a new trial.

### B.    Challenges to the Verdict on the IIED Claim

As to the IIED claim, however, Meyers offers three reasons why the jury's verdict should be tossed under Rule 50(b).  He contends that the inter-spousal immunity doctrine precluded Allam from any recovery on her IIED claim.[4]  (Mem. at 8–9.)  Meyers argues that Allam failed to

---

[3] To the extent Meyers intended to challenge this determination under Rule 50(b), he fails.  Allam's testimony, along with other evidence at trial, provided ample evidence supporting the jury's conclusion that Meyers assaulted and battered Allam.  Though Meyers denied such conduct, the jury had a sufficient legal and factual basis for its verdict on liability.  The jury plainly believed Allam, and we may not question the jury's credibility determination.  *Gatti*, 263 F. Supp. 2d at 503.

[4] Meyers previously raised the inter-spousal immunity issue, and this court has twice rejected Meyers' contention that Allam could not base an IIED claim on conduct that took place while the parties lived together for a nine-month period *prior* to their marriage.  *See Allam v. Meyers*, No. 09 C 10580, 2012 WL 1106746, at *2 (S.D.N.Y. Apr. 3, 2012) [hereinafter *Allam II*]; *Allam v. Meyers*, No. 09 C 10580, 2011 WL 721648, at *9–10 (S.D.N.Y. Feb. 24, 2011) [hereinafter *Allam I*].  We

show sufficiently serious permanent injury or severe psychological damage, as legally required to succeed on a IIED claim.[5]  (Mem. at 5–7.)  Meyers also contends that the verdict cannot stand because Allam did not support her IIED claim with medical evidence.  (*Id.* at 7–8.)  We find merit in this last argument.

As Meyers correctly argues, governing New York law[6] requires plaintiffs to "present medical evidence of severe emotional distress" to substantiate their IIED claims.  *Roche v. Claverack Coop. Inc. Co.*, 59 A.D.3d 914, 919, 874 N.Y.S.2d 592 (N.Y. App. Div. 2009); *Cusimano v. United Health Servs. Hosps., Inc.*, 91 A.D.3d 1149, 1152, 937 N.Y.S.2d 413 (N.Y. App. Div. 2012); *Walentas v. Johnes*, 257 A.D.2d 352, 353, 683 N.Y.S.2d 56 (N.Y. App. Div. 1999); *Christenson v. Gutman*, 249 A.D.2d 805, 808–09, 671 N.Y.S.2d 835 (N.Y. App. Div. 1998); *see also Biberaj v. Pritchard Indus., Inc.*, 859 F. Supp. 2d 549, 565 (S.D.N.Y. 2012). Objective medical evidence is relevant to the fourth element of an IIED cause of action concerning the severity of the emotional distress and is necessary to prove that the plaintiff's claimed distress is not speculative.  *Roche*, 59 A.D.3d at 919; *Walentas*, 257 A.D.2d at 353; *Christenson*, 249 A.D.2d at 809; *see also Bujnicki v. Am. Paving & Excavating, Inc.*, No. 99 C

---

will not revisit this issue again.

[5] Judge Wood addressed this claim at the motion to dismiss stage and concluded that Allam's claims were sufficiently outrageous to state an IIED claim at that juncture.  *Allam I*, 2011 WL 721648, at *6–8, 10–11 (holding that Allam's remaining actionable non-duplicative claims, "if true, establish a deliberate and malicious campaign of harassment and intimidation, and satisfy the outrageousness requirement of her IIED claim").

[6] As a federal court sitting in diversity, we apply the state substantive law of New York to resolve the claims raised in this matter.  *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427, 116 S. Ct. 2211, 2219 (1996); *Williams v. J.P. Morgan & Co.*, 199 F. Supp. 2d 189, 191 (S.D.N.Y. 2002).

646, 2004 WL 1071674, at *14–15 (W.D.N.Y. Mar. 30, 2004).  Although the parties previously disputed whether Allam needed to provide a medical expert at trial, we have yet to address this related issue.  In resolving Meyers' motion in limine, we held that Allam did not need to offer a medical expert and could proceed to trial relying on medical records that had been disclosed to Meyers.  *See Allam II*, 2012 WL 1106746, at *2.

In his present motion, Meyers points out that the medical records Allam introduced at trial did not confirm or otherwise support her claim of severe emotional distress and also failed to show any serious permanent physical injury.  (Mem. at 8.)  Allam apparently concedes as much.  (Resp. at 16–18.)  Allam now contends, however, that medical proof of emotional distress is not truly necessary to establish an IIED claim.  (*Id.* at 16–17.)  The New York state courts, as well as relevant federal authorities, have been somewhat inconsistent on this point.

Allam cites to a line of cases suggesting that medical evidence is not necessarily required, particularly in cases where either the outrageousness of the conduct is not disputed or special circumstances guarantee resultant genuine and serious mental distress.  *See Zane v. Corbett*, 82 A.D.3d 1603, 1608, 919 N.Y.S.2d 625, 629–30 (N.Y. App. Div. 2011); *Hughes v. Pacienza*, 950 N.Y.S.2d 723, 2012 WL 1130204, at *3 (N.Y. Sup. Ct. Apr. 3, 2012); *Murray v. 600 E. 21st St. LLC*, 18 Misc. 3d 762, 765–66, 850 N.Y.S.2d 329, 332 (N.Y. Sup. Ct. 2007); *see also Sylvester v. City of New York*, 385 F. Supp. 2d 431, 444 (S.D.N.Y. 2005) (noting that some courts have not required medical evidence).  At bottom, these cases generally rely on an older New York Court of Appeals case addressing a negligent infliction of emotional distress ("NIED") claim.  *Johnson v. State of New York*, 334 N.E.2d 590, 593, 372 N.Y.S.2d 638, 643 (N.Y. 1975).  There, the plaintiff sought emotional damages related to her tort claim against a hospital that had

negligently and falsely informed the plaintiff that her mother had died.  The court allowed

emotional damages proximately caused by the hospital's negligence in light of the special

circumstances ensuring that the claim was not spurious.  *Id.* at 592–93, 372 N.Y.S.2d at 642–43.

The *Johnson* ruling thus stands for the proposition—not applicable here—that emotional

damages are permitted in NIED claims, in certain narrow circumstances, despite a lack of

physical injury or danger to the plaintiff.  *Id.* at 591–93, 372 N.Y.S.2d at 641–43.  Our thorough

review of New York state and federal authorities shows that the *Johnson* case is typically cited

specifically for analysis of NIED claims, even where IIED claims are also present.  Ultimately,

we find that *Johnson* and the cases relying on it are not particularly instructive or convincing on

this precise question.  *Id.* at 592–93, 372 N.Y.S.2d at 642–43 (allowing emotional damages on

NIED claim "so long as the evidence is sufficient to show causation and substantiality of the

harm suffered, together with a guarantee of genuineness").

      On the other hand, we are persuaded by the predominant weight of authorities, including

the appellate division cases cited above, which explicitly address this issue and require medical

evidence to substantiate the emotional distress component.  *See, e.g.*, *Biberaj*, 859 F. Supp. 2d at

565 (citing cases and noting that "[c]ourts routinely grant summary judgment against plaintiffs

where they have failed to present medical evidence"); *Woods v. Sieger, Ross & Aguire, LLC*,

No. 11 C 5698, 2012 WL 1811628, at *8 (S.D.N.Y. May 18, 2012); *Gordon v. Softech Int'l, Inc.*,

828 F. Supp. 2d 665, 677–78 (S.D.N.Y. 2011); *Dobbs v. Dobbs*, No. 06 C 6104, 2008 WL

3843528, at *14–15 & nn.7–8 (S.D.N.Y. Aug. 14, 2008).  We agree with the rationale set forth in

*Woods*, that although compensation for general emotional distress may be warranted for

independent claims, such a "finding does not *ipso facto* create a valid cause of action" for IIED in

the absence of medical proof.  2012 WL 1811628, at *8 (accepting plaintiff's complaints of sleep deprivation, anxiety, headaches, humiliation, crying, and the like, but concluding that the recitation of such symptoms did "not establish the severe emotional distress necessary" to show IIED).  Accordingly, we conclude that the jury's verdict in favor of Allam on her IIED claim cannot stand.  We therefore grant Meyers' JMOL motion on the IIED claim only.

That being said, this ruling represents a hollow victory for Meyers because it has no bearing on the overall damages awards.  As mentioned earlier, the verdict sheet in this matter did not ask the jury to apportion damages among the three causes of action.  (*See* Dkt. No. 52.)  We cannot ascertain what portion of the awards, if any, stems from the IIED verdict.  Because we do not know whether, or to what extent, the IIED verdict played a role in the jury's damages calculation, we are in no position reduce the damages on this basis.  *See Hutchinson v. McCabee*, 168 F. Supp. 2d 101, 103–04 (S.D.N.Y. 2001) (rejecting argument that damages were speculative because plaintiff fail to prove a nose injury during one of two assaults, where the verdict form did not ask what portion of the award, if any, concerned that injury and, thus, the court could not ascertain if the jury even considered the nose injury).  Indeed, we must be as faithful to the jury's verdict as possible.  *See Rangolan v. Cty. of Nassau*, 370 F.3d 239, 244–45 (2d Cir. 2004); *Earl v. Bouchard Transp. Co.*. 917 F.2d 1320, 1330 (2d Cir. 1990).

## II.     Motion for A New Trial

Along with a renewed motion for JMOL, a party "may include an alternative or joint request for a new trial under Rule 59."  Fed. R. Civ. P. 50(b).  As set forth by the Second Circuit, a new trial is required "if the court is convinced that the jury has reached a seriously erroneous result, or that the verdict is against the weight of the evidence, making its enforcement a

miscarriage of justice." *Health Alliance Network, Inc. v. Cont'l Cas. Co.*, 245 F.R.D. 121, 127 (S.D.N.Y. 2007) (internal quotation omitted); *see DLC Mgmt Corp. v. Town of Hyde Park*, 163 F.3d 124, 133–34 (2d Cir. 1998); *Tse v. UBS Fin. Servs., Inc.*, 568 F. Supp. 2d 274, 286–88 (S.D.N.Y. 2008).  Here, Meyers contends that the jury's verdict was against the clear weight of the evidence.  (Mem. at 11.)

In analyzing this contention, we are permitted to weigh the evidence ourselves and "need not view it in the light most favorable to the verdict winner." *DLC Mgmt Corp.*, 163 F.3d at 134 (internal citation omitted); *Tse*, 568 F. Supp. 2d at 287.  Yet we "should only grant such a motion when the jury's verdict is egregious" and, moreover, "should rarely disturb a jury's evaluation of a witness's credibility." *DLC Mgmt Corp.*, 163 F.3d at 134 (internal quotation omitted); *Tse*, 568 F. Supp. 2d at 287.  Ultimately, we must deny a motion for a new trial as long as a reasonable jury could have reached the verdict under review—even if we might have reached a different conclusion had we acted as the finder of fact at trial.  *Mallis v. Bankers Trust Co.*, 717 F.2d 683, 691 (2d Cir. 1983) ("It is well settled that a trial judge's disagreement with the jury's verdict is not sufficient reason to grant a new trial."); *Tse*, 568 F. Supp. 2d at 287.  "The decision whether to grant a new trial following a jury trial under Rule 59 is committed to the sound discretion of the trial judge." *Hallinan v. Republic Bank & Trust Co.*, 519 F. Supp. 2d 340, 347 (S.D.N.Y. 2007) (internal quotation omitted); *Bucalo*, 691 F.3d at 128.

### A.    New Trial on Liability for Assault and Battery

Meyers' request for a new trial on liability need not detain us long.  Boiled down, Meyers attempts to paint Allam's testimony as inconsistent and incredible.  (Mem. at 11–12.)  We agree with Allam that the few purported discrepancies highlighted by Meyers are neither contradictory,

nor significant.  Allam testified to at least seven instances where Meyers struck, threatened

and/or hurt her during their engagement.  She further described in detail the beating that occurred

in their home on the morning of October 17, 2009, and that she feared for her life at that time.

(Trial Tr. at 109, 113–15, 117, 119–20, 127–49, 187–88.)  Although Meyers denied ever hitting

or otherwise abusing Allam, (*id.* at 228–29), the jury was not required to believe him.  In light of

Allam's extensive and consistent testimony, as well as corroborating medical and police

evidence, we cannot conclude that the jury's conclusion was seriously erroneous or otherwise

represents a miscarriage of justice.  *See DLC Mgmt Corp.*, 163 F.3d at 133–34; *Tse*, 568 F. Supp.

2d at 287.  Even if we found merit in Meyers' present arguments (though we do not), we see no

reason on the record before us to disturb either the jury's assessment of the parties' credibility or

the jury's ultimate verdict of liability for assault and battery.

### B.      New Trial on Liability for IIED

Pursuant to Rule 50(c)(1), we are required to conditionally rule on the necessity of a new

trial if our grant of JMOL on the IIED claim is later vacated or reversed by a higher court.  Fed.

R. Civ. P. 50(c)(1); *see Neely v. Martin K. Eby Constr. Co.*, 386 U.S. 317, 321–24, 87 S. Ct.

1072, 1076–78 (1967); *Fioto v. Manhattan Woods Golf Enters., LLC.*, 304 F. Supp. 2d 541, 548

(S.D.N.Y. 2004); *Whitton v. Williams*, 90 F. Supp. 2d 420, 430–31 (S.D.N.Y. 2000).  We must

thus consider whether Meyers should receive a new trial in the event that the Second Circuit

concludes on appeal that medical evidence is not required to support an IIED claim.

To succeed on her IIED claim, Allam needed to prove: "(1) extreme and outrageous

conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe

emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe

emotional distress." *Biberaj*, 859 F. Supp. 2d at 564 (internal quotation omitted).  As is often said, the underlying conduct must be "so extreme and outrageous that it transcends the bounds of decency as to be regarded as atrocious and intolerable in a civilized society."  *Id.* (internal quotation omitted).  Meyers contends that Allam failed to show that his conduct was sufficiently extreme and outrageous or that it caused severe emotional distress.  (Mem. at 5–7.)

Judge Wood previously held that Allam's allegations, if proven, would "establish a deliberate and malicious campaign of harassment and intimidation, and satisfy the outrageousness requirement of her IIED claim."  *Allam I*, 2011 WL 721648, at *6–8, 10–11 (citing cases).  We agree with Judge Wood's assessment and, moreover, find that the evidence introduced by Allam adequately supports the jury's verdict.  The jury heard testimony about Meyers' violent, controlling, and demeaning behavior.  Prior to their marriage,[7] Meyers repeatedly slapped Allam, injured her neck by pulling her hair and pushing her into a car in public, humiliated her in front of others, forbade her to continue English classes, ordered her not to socialize with a friend, and abandoned her at restaurants without money or any means of getting home.  (Trial Tr. at 103–10, 113–15, 117–21, 187–88, 192.)

On one occasion when Allam went out with a friend, Meyers put her belongings in garbage bags, placed them in the basement of their apartment building, and told the doorman not to let her enter.  (*Id.* at 115.)  When she arrived home, he came down from the apartment and began shaking and threatening her.  Meyers said he would never leave her alone while she lived in this country and would kill her.  (*Id.*)  She fled and stayed with her friend for days.  (*Id.* at

---

[7] Pursuant to the inter-spousal immunity doctrine, none of the incidents that took place during the parties' marriage—specifically, the events of October 16–17, 2009—can give rise to an IIED claim.  *Allam II*, 2012 WL 1106746, at *2; *Allam I*, 2011 WL 721648, at *9–10.

115–16.)  On a different night, Meyers got into a fight at a bar with another man, who spoke in French to Allam.  (*Id.* at 118–20.)  Allam and Meyers returned to their hotel room, but Allam was scared to stay with him.  She left the room for a cigarette, but Meyers followed her, pulled her back by her hair and slapped her.  She attempted suicide the following day, after he ignored and then further insulted her.  (*Id.* at 121.)

Allam also testified to other physical and emotional pain.  She began seeing a chiropractor in July 2009, after her neck injury, and went to the hospital weeks later due to the continuing pain.  (*Id.* at 110.)  The chiropractic treatments apparently did not help, and Allam testified that she still has neck pain today.  (*Id.* at 110, 193.)  She practices yoga and has acupuncture treatments to alleviate her symptoms.  (*Id.* at 193.)  She testified that at times she has been depressed and emotionally disturbed.  (*Id.* at 110, 197.)  Allam stated that Meyers' behavior has impaired her ability to sleep, to focus, and to connect with other people in daily life.  (*Id.* at 209–10.)  She testified that she is unable to trust people.  (*Id.* at 209.)  Allam testified that she began seeing a therapist, who she continued to see on and off and intends to see again in the future.  (*Id.* at 210–12 (testifying that she had seen her therapist three months prior to trial).)

In light of this evidence, we would not exercise our discretion to say that the jury reached a seriously erroneous or egregious result.  This case turned largely on witness credibility, and the jury simply believed Allam over Meyers.  Moreover, much of Allam's testimony was corroborated.  The jurors deemed Meyers' conduct, in the aggregate, to be outrageous, indecent, and intolerable.  They also apparently concluded that Allam indeed suffered severe emotional distress.  Accordingly, pursuant to Rule 50(c)(1), we conditionally conclude that—if the Second Circuit holds that New York courts do not require medical evidence to support IIED claims—a

new trial on these facts would not be warranted to prevent injustice.

### C.    Request for Remittitur

As set forth in detail in his reply brief, Meyers contends that the jury's compensatory and punitive damages awards were unfounded and grossly excessive.  (*See* Reply at 4–9.)  In addressing the merits of this argument, we consider the awards based on the assault and battery verdicts only, as we have dismissed the verdict on the IIED claim.  We begin with Meyers' challenges to the award for pain and suffering.

#### 1.    *Compensatory Damages for Pain and Suffering*

##### a.    *Loss of Enjoyment of Life*

Meyers protests the jury's $200,000 award for Allam's pain and suffering on the grounds that she suffered no loss of enjoyment of life.  (Mem. at 3–5; Reply at 4.)  Meyers contends that Allam sustained no permanent serious injury and is better off now than she was while living with him.  (Mem. at 3–5; Reply at 4.)  As Allam points out, however, "loss of enjoyment of life is . . . only a factor to be considered by the jury in assessing damages for conscious pain and suffering." *Grandinetti v. Rose*, 155 A.D.2d 378, 379, 548 N.Y.S.2d 8, 9 (N.Y. App. Div. 1989); *McDougald v. Garber*, 536 N.E.2d 372, 375–77, 538 N.Y.S.2d 246, 255–58 (N.Y. 1989).  As the New York Court of Appeals explained in *McDougald*, nonpecuniary damages "such as pain and suffering" are "awarded to compensate an injured person for the physical and emotional consequences of the injury."  536 N.E.2d at 373, 538 N.Y.S.2d at 251.  Although Allam's testimony shows that she has largely recovered in the intervening years from Meyers' mistreatment, she is still entitled to compensation for the physical and emotional tolls inflicted by his tortious conduct.

-14-

b.    *Appropriateness of the Award*

Meyers next asserts that the award for pain and suffering is excessive and must be either eliminated or substantially reduced.  (Reply at 5–9.)  Under applicable New York state law, "a monetary judgment is excessive 'if it deviates materially from what would be reasonable compensation.'"  *Rangolan*, 370 F.3d at 244 (quoting N.Y. C.P.L.R. § 5501(c)); *see Gasperini*, 518 U.S. at 425, 116 S. Ct. at 2218–19; *Welch v. UPS*, No. 09 C 4400, 2012 WL 2552185, at *23 (E.D.N.Y. June 30, 2012); *Okraynets v. Metro. Transp. Auth.*, 555 F. Supp. 2d 420, 434–35 (S.D.N.Y. 2008).  In determining whether an award "deviates materially from what would be reasonable compensation," N.Y. C.P.L.R. § 5501(c), we compare the jury's award to awards allowed in analogous cases involving similar types of injuries.  *Gasperini*, 518 U.S. at 425, 116 S. Ct. at 2218; *Rangolan*, 370 F.3d at 244; *Okraynets*, 555 F. Supp. 2d at 435.  While instructive, such earlier awards are not binding for our review.  *Lewis v. City of New York*, 689 F. Supp. 2d 417, 430 (S.D.N.Y. 2010); *Okraynets*, 555 F. Supp. 2d at 436.

Although we look to prior awards in similar matters, we also bear in mind that "awards for pain and suffering . . . do not lend themselves as easily to computation" as quantifiable economic awards, such as compensation for past medical bills.  *Okraynets*, 555 F. Supp. 2d at 435 (internal quotation omitted); *In re Joint E. & S. Asbestos Litig.*, 9 F. Supp. 2d 307, 311–12 (S.D.N.Y. 1998); *see McDougald*, 536 N.E.2d at 374–75, 538 N.Y.S.2d at 939–40 (explaining our indulgence in the legal fiction that money can compensate a victim for injury even though "[w]e have no hope of evaluating what has been lost").  To the contrary, "[m]easuring pain and suffering is heavily subjective and fact specific."  *Lewis*, 689 F. Supp. 2d at 433; *Okraynets*, 555 F. Supp. 2d at 435–36.  As a result, reviewing the appropriateness of an award under § 5501(c) is

-15-

"one of the most difficult decisions" we face as a trial court.  *In re Joint E. & S. Asbestos Litig.*, 9

F. Supp. 2d at 311 (internal quotation omitted); *Lewis*, 689 F. Supp. 2d at 433; *Okraynets*, 555

F. Supp. 2d at 436.

If we determine that a jury award deviates materially from what we consider to be

reasonable compensation, we may order a new trial without qualification, a new trial specific to

damages, or a new trial "conditioned on the verdict winner's refusal to agree to a reduction

(remittitur)."  *Gasperini*, 518 U.S. at 433, 116 S. Ct. at 2222; *Rangolan*, 370 F.3d at 243.  Where,

as here, the issue is whether the award is intrinsically excessive, we may reduce the award only to

the maximum or "upper limit" we would not find excessive.  *Rangolan*, 370 F.3d at 244–45;

*Okraynets*, 555 F. Supp. 2d at 436–37.  Because the fixation of damages is primarily a question

of fact for the jury, whose determination is entitled to considerable deference, remittitur "is to be

exercised sparingly."  *In re Joint E. & S. Asbestos Litig.*, 9 F. Supp. 2d at 311 (internal quotation

omitted); *Rangolan*, 370 F.3d at 244–45; *Okraynets*, 555 F. Supp. 2d at 437.

As detailed above, the jury found Meyers liable for assault and battery due to his repeated

attacks on Allam, some of which were more serious than others.  Our comparison to other cases

is hampered by the fact that there are few reported opinions addressing civil tort damages

stemming from abusive relationships, as here.  Some cases address damages for emotional

distress within an ongoing personal or professional relationship—with or without assault and

battery claims—or damages related to repeated childhood sexual abuse.  *See, e.g.*, *Welch*, 2012

WL 2552185, at *23–30 (surveying the "spectrum of emotional damages in the employment

discrimination context" and denying remittitur on an $200,000 award in a "more than a garden

variety type of case"); *Funk v. F&K Supply Co.*, 43 F. Supp. 2d 205, 226–228 (N.D.N.Y. 1999)

(reviewing awards in similar employment matters and remitting awards for mental anguish to $30,000); *Lagueux v. Hayes*, 241 A.D.2d 813, 814, 661 N.Y.S.2d 86, 87 (N.Y. App. Div. 1997) (ordering a new trial on damages that were insufficient to compensate woman injured when her "live-in boyfriend slammed her face into a wall"); *Laurie Marie M. v. Jeffrey T.M.*, 159 A.D.2d 52, 56–58, 559 N.Y.S.2d 336, 339–40 (N.Y. App. Div. 1990) (remitting damages to $100,000 for woman sexually touched by her stepfather as a child on multiple occasions over the course of several weeks); *Murphy v. Murphy*, 109 A.D.2d 965, 967, 486 N.Y.S.2d 457 (N.Y. App. Div. 1985) (reducing damages for IIED claim to $45,000 where plaintiff suffered no permanent distress); *Morgan v. State of N.Y.*, 65 Misc. 2d 978, 984–93, 319 N.Y.S.2d 151, 157–66 (N.Y. Ct. Cl. 1970) (imposing $15,000 award (now valued at roughly $90,000) for personal injuries, including pain and suffering, as a result of repeated assaults of a woman committed to a state hospital).

But New York state and federal cases discussing damages for assault and battery most often concern single instances of personal injury, including accidents, § 1983 allegations of officer or municipal misconduct, and intentional attacks.  *See, e.g.*, *Rangolan*, 370 F.3d at 242–47; *DiSorbo v. Hoy*, 343 F.3d 172, 76–80, 183–86 (2d Cir. 2003); *Hygh v. Jacobs*, 961 F.2d 359, 361, 366 (2d Cir. 1992); *Gardner v. Federated Dep't Stores*, 907 F.2d 1348, 1350–53 (2d Cir. 1990); *Grynberg v. City of N.Y.*, No. 08 C 2895, 2010 WL 2985914, at *1, 5–7 (E.D.N.Y. July 27, 2010); *Okraynets*, 555 F. Supp. 2d at 437–40; *Tatum v. Jackson*, 668 F. Supp. 2d 584, 589–90, 599–603 (S.D.N.Y. 2009); *Weiss v. Gueldner*, No. 00 C 8945,  2001 WL 604053, at *1 (S.D.N.Y. May 31, 2001) & 2000 WL 34612003 (Nov. 22, 2000) (Complaint); *Offei v. Omar*, No. 11 C 4283, 2012 WL 2086294, at *1–7 (S.D.N.Y. May 18, 2012); *Desir v. Sburlati*, 35

A.D.3d 650, 824 N.Y.S.2d 921, 922 (N.Y. App. Div. 2006) & 2005 WL 5352977 (Dec. 19,

2005) (Brief, describing factual background); *Herrera v. Braunstein*, 10 Misc. 3d 104, 105–07,

810 N.Y.S.2d 775, 776–77 (N.Y. App. Div. 2006); *Rodriguez v. Barber*, 28 Misc. 3d 1229(A),

2010 WL 3398548, at *1–3 (N.Y. Sup. Ct. July 26, 2010); *Becker v. City of N.Y.*, 192 Misc. 2d

194, 200–02, 745 N.Y.S.2d 857, 863–64 (N.Y. Civ. Ct. 2002); *Shank v. Riker Rests. Assocs.,*

*Inc.*, 28 Misc. 2d 835, 836–38, 216 N.Y.S.2d 118, 119–21 (N.Y. Sup. Ct. 1961).

   Many of these cases, in turn, involve extremely serious and/or permanent physical

injuries, making them less suitable for comparison purposes.  *See, e.g.*, *Hygh*, 961 F.2d at

361–62, 366 ($216,000 award for excessive force claim where police struck plaintiff in the face

with a flashlight, requiring surgery and causing permanent numbness); *Ismail v. Cohen*, 899 F.2d

183 (2d Cir. 1990) (reinstating $650,000 compensatory damages award on various claims

relating to officer's striking and threatening plaintiff, resulting in head trauma, cracked ribs,

chronic pain and emotional anguish); *Grynberg*, 2010 WL 2985914, at *1, 5–7 (awarding

$550,000 to victim in boat accident for his psychological trauma, damage to nose, and permanent

TMJ injury); *Tatum*, 668 F. Supp. 2d at 589–90, 601–02 (awarding $1 million to pre-trial

detainee who was injured by other inmates, resulting in multiple facial bone fractures, several

surgeries, intense pain, loss of teeth, and limited chewing abilities); *Okraynets*, 555 F. Supp. 2d

at 437–40 (remitting past pain and suffering award to $2.5 million for construction accident

victim rendered paraplegic); *Weiss*, 2000 WL 34612003 & 2001 WL 604053, at *1 (granting

$150,000 for past pain and suffering to woman who suffered serious facial and dental injuries

when thrown to the ground violently by her assailant); *Desir*, 2005 WL 5352977 & 824 N.Y.S.2d

at 922 (allowing $200,000 for past pain and suffering for permanent leg injuries to man after co-

worker threw a knife at him); *Rodriguez*, 2010 WL 3398548, at *1–2 (increasing jury award of $10,000 to $50,000 for past and future pain and suffering for woman injured in a fall down stairs, necessitating surgery and resulting in permanent damage and scarring).

We take all such cases into consideration,[8] yet also must account for the somewhat unique nature of this case, which involves a series of less severe physical injuries paired with compounding emotional consequences.  Moreover, to the extent that the jury's award includes damages for the emotional harm attendant to the assault and battery claims, such damages are allowable.  *Allam I*, 2011 WL 721648, at *10 n.5 (explaining that, under well-settled law, Allam could recover "for the emotional distress that resulted from the commission of the 'traditional' torts alleged here"); *see Woods*, 2012 WL 1811628, at *8 (compensating plaintiff for general emotional distress related to plaintiff's successful claim under the Fair Debt Collection Practices Act); *Denman v. Sanders*, No. 05 C 0025, 2006 WL 452018, at *6 (S.D.N.Y. Feb. 24, 2006) (recounting victim's testimony as to emotional consequences—fear, embarrassment, lasting uneasiness, and foolishness—resulting from a single instance of assault and battery).

Our survey of relevant authorities identified several useful comparators, permitting awards around $100,000 for single instances of comparable assault and battery without resulting permanent injury.  In *Kroupova v. Hill*, a passenger was assaulted by a bus driver as she attempted to board the bus.  242 A.D.2d 218, 218–19, 661 N.Y.S.2d 218, 219–20 (N.Y. App. Div. 1997).  The driver ripped up the requested transfer ticket and threw it at her, called her

---

[8] In conducting this review, we have been careful not to limit our consideration of other cases to those simply alleging state law assault and battery.  We have researched § 1983 claims, employment disputes, and all types of personal injury cases.  *See, e.g.*, *Ismail*, 899 F.2d at 186 (reversing district court's remittitur where the "court improperly limited its frame of reference to federal § 1983 claims").

"stupid," and then accelerated the bus so that she fell forward into the coin machine and front

window.  When the plaintiff called the driver a "'creep,' [he] stopped the bus, stood up, yelled a

racial and obscene slur, and beat her in the face, finally pushing her back into the coin machine."

*Id.*  The plaintiff later sought hospital treatment for bruises, a neck injury (cervical sprain),

nausea, and dizziness.  *Id.*  The jury returned a verdict against the driver and awarded plaintiff

$1,782,063.  *Id.* at 219–20, 661 N.Y.S.2d at 220–21.  Of that amount, $1.3 million (about 73%)

represented an award for past and future pain and suffering.  The supreme court upheld the

verdict as to the driver's liability for assault and battery but reduced the total compensatory

damages award to $100,000.  *Id.* at 218, 220–21, 661 N.Y.S.2d at 219, 220–21.  The appellate

division approved.  Accounting for inflation,[9] the reduced compensatory award is valued at

$144,178.  Although it is unclear how the final award against the driver may have been broken

down,[10] if we follow the jury's initial allocation of 73%, the appellate division allowed an award

of approximately $105,000 for pain and suffering for this incident, in today's terms.

The plaintiff in *Nash v. Sue Har Equities, LLC* sued a motel operator after he was

attacked while staying overnight at an inn.  45 A.D.3d 545, 545–46, 846 N.Y.S.2d 215, 215–16

(N.Y. App. Div. 2007) & 2006 WL 5093743, at *1–3 (N.Y. App. Div. Dec. 19, 2006) (Brief,

---

[9] We rely on the Bureau of Labor Statistics' Inflation Calculator to estimate dollar equivalents
as we consider similar cases for purposes of this motion.  CPI Inflation Calculator, *available at*
http://www.bls.gov/data/inflation_calculator.htm (last visited Oct. 29, 2012); *Tatum*, 668 F. Supp.
2d at 603 n.18.

[10] The supreme court's decision reducing the compensatory damages award is not readily
available.  Thus, we cannot say for sure if (or how) the judge may have broken down the remitted
award between medical expenses, lost earnings, and pain and suffering.  *Kroupova*, 242 A.D.2d at
218, 220–21, 661 N.Y.S.2d at 219, 220–21.

describing factual background).  Having heard banging at the door, the plaintiff opened his motel room door to a man who entered the room, struck him twice on the temple with a gun and demanded money.  *Nash*, 2006 WL 5093743, at *1–3.  Although the plaintiff required several stitches and suffered pain, the jury's award of $190,000 was deemed excessive.  The appellate court remitted the award down to $100,000 (equivalent now to $111,606) given the lack of evidence "expert or otherwise, sufficient to establish the severity and permanency of his injuries."  45 A.D.3d at 546, 846 N.Y.S.2d at 216.

In our view, these two authorities describe scenarios comparable to the October 17 incident, which caused Allam to fear for her life, as well as the July 2009 incident when Meyers publicly grabbed and yanked Allam's hair, injured her neck, and shoved her into a parked car. Allam, like the plaintiffs in *Nash* and *Kroupova*, did not present evidence showing any severe or permanent injury.  Nonetheless, she too proved that she suffered physical pain and injuries on these occasions, including the lingering neck injury and, with respect to the October 17 beating, cuts to her face and legs in addition to the consequences of Meyers' punching and kicking her in the stomach and head.  Both attacks required Allam to seek medical and psychological assistance, including hospital treatment.  Allam also testified as to the emotional ramifications of these attacks, as detailed earlier.  Under these circumstances, we find that an award of $100,000 on each of these incidents would not deviate materially from what New York courts consider reasonable compensation.  Moreover, given the similarities between *Nash*, *Kroupova,* and the present case, we cannot reduce the award to Allam without running afoul of the Seventh Amendment.  *Rangolan*, 370 F.3d at 247 (instructing that we "should not reduce a jury verdict to less than the maximum previously held to be reasonable for injuries of similar severity" because

any further reduction would be inconsistent with the Seventh Amendment); *see also Gasperini*, 518 U.S. at 432, 438, 116 S. Ct. at 2222, 2224–25 (explaining that the Seventh Amendment right to jury trial in a civil case also "controls the allocation of authority to review verdicts").

In addition, we find that the jury was authorized in light of the evidence presented at trial to award some damages for the other six specific incidents of assault and battery that Allam described at trial.  During one of these incidents, for example, Meyers grabbed and shook Allam, pulled her hair, and threatened to kill her.  Although the additional incidents of slapping, shaking, and threatening are relatively less serious, the jury could reasonably have included them in their damages calculation.

All in all, we do not find that the $200,000 award for pain and suffering deviates materially from what constitutes reasonable compensation under New York law.  The more serious July and October 2009 attacks merit compensation up to $100,000 each, according to New York appellate division precedent.  Even if the jury placed a slightly lower value on each of those incidents, they could have reasonably factored in the other six instances of abuse when calculating their damages award.  Accordingly, we decline to exercise our discretion to reduce the compensatory damages award.

### 2.    *Punitive Damages for Assault and Battery*

Our review of the punitive damages award involves two questions.  First, we consider whether the jury was justified in imposing punitive damages at all.  Second, we consider whether the amount of damages imposed is excessive, as Meyers contends.

### a.    *Did Meyers' conduct warrant punitive damages?*

"An award of punitive damages serves the dual purpose of punishing the offending party

and deterring similar conduct on the part of others." *Solis-Vicuna v. Notias*, 71 A.D.3d 868, 871, 898 N.Y.S.2d 45, 48 (N.Y. App. Div. 2010); *Walker v. Sheldon*, 179 N.E.2d 497, 498, 10 N.Y.2d 401, 404 (N.Y. 1961); *D'Elia v. 58-35 Utopia Parkway Corp.*, 43 A.D.3d 976, 979, 843 N.Y.S.2d 339, 341–42 (N.Y. App. Div. 2007).  Under New York law, "punitive damages may be assessed where a defendant's actions evince a high degree of moral culpability or demonstrate a wanton or reckless disregard for the rights of the plaintiff." *Solis-Vicuna*, 71 A.D.3d at 871, 898 N.Y.S.2d at 48; *Walker*, 179 N.E.2d at 498, 10 N.Y.2d at 404; *Randi A.J. v. Long Island Surgi-Center*, 46 A.D.3d 74, 80–82, 842 N.Y.S.2d 558, 564–65 (N.Y. App. Div. 2007); *Laurie Marie M.*, 159 A.D.2d at 58, 559 N.Y.S.2d at 340; *see also Offei*, 2012 WL 2086294, at *7.  The decision whether to award punitive damages rests "within the sound discretion of the jury, and an award of punitive damages should not be lightly disturbed." *Solis-Vicuna*, 71 A.D.3d at 871, 898 N.Y.S.2d at 48; *Nardelli v. Stamberg*, 377 N.E.2d 975, 977, 406 N.Y.S.2d 443, 445 (N.Y. 1978); *Tse*, 568 F. Supp. 2d at 310 (concluding that, because plaintiff satisfied the burden of showing reckless indifference in that case, the jury's "decision to award punitive damages may not be disturbed").

Meyers does not directly challenge the jury's decision to award punitive damages, focusing instead on the size of the award.[11]  (Mem. at 9–10; Reply at 9.)  Nonetheless, we see no reason to disturb the jury's decision.  Having heard evidence of Meyers' repeated abuse—demonstrating, at a minimum, a reckless disregard for Allam's well-being—the jury was

_____

[11] Meyers suggests that the punitive damages award here will "likely open a Pandora's box to civil assault and battery claims in federal court." (Mem. at 10.)  This argument misses the mark, as it relates to the limited jurisdiction a federal court might have over similar claims.  (*Id.*)  The scope of federal jurisdiction has little, if anything, to do with the appropriateness of punitive damages for claims properly brought before this court.

well within its rights to impose an award intended to punish Meyers' conduct and deter others from similar behavior.

> b.  Was the $300,000 punitive damages award excessive?

The more vexing question is whether the jury's $300,000 award is excessive.  Meyers contends that the award is neither reasonable, nor proportionate to the harm suffered by Allam.[12] (Mem. at 9–10; Reply at 9.)  "Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose."  *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575, 116 S. Ct. 1589, 1599 (1996).  Punitive damages awards that are grossly excessive or arbitrary violate the Due Process Clause of the Fourteenth Amendment.  *State Farm Mutual Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416, 123 S. Ct. 1513, 1519–20 (2003).  We thus consider three guideposts to ensure the validity of a punitive damages award: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases."  *Campbell*, 538 U.S. at 418, 123 S. Ct. at 1520; *Gore*, 517 U.S. at 575, 116 S. Ct. at 1598–99; *Payne v. Jones*, — F.3d —, 2012 WL 4513114, at *10 (2d Cir. Oct. 3, 2012).

"Perhaps the most important indicium of the reasonableness of a punitive damages award

---

[12] Relatedly, Meyers did not present evidence of his financial circumstances at trial and has not argued that he is unable to pay a punitive damages award.  *See Mathie v. Fries*, 121 F.3d 808, 816 (2d Cir. 1997) ("Under well established precedent in this Circuit, it is the defendant's burden to show that his financial circumstances warrant a limitation of the award.") (internal quotation omitted).

is the degree of reprehensibility of the defendant's conduct."  *Gore*, 517 U.S. at 575, 116 S. Ct. at

1599.  This first guidepost requires that we consider several aggravating factors, including

whether:

> the harm caused was physical as opposed to economic; the tortious conduct evinced
> an indifference to or a reckless disregard of the health or safety of others; the target
> of the conduct had financial vulnerability; the conduct involved repeated actions or
> was an isolated incident; and the harm was the result of intentional malice, trickery,
> or deceit, or mere accident.

*Campbell*, 538 U.S. at 419, 123 S. Ct. at 1521; *Lee v. Edwards*, 101 F.3d 805, 809–10 (2d Cir.

1996); *Tse*, 568 F. Supp. 2d at 312.  The harm in this case involved repeated, intentional acts of

violence and threats of violence.  Such "repeated conduct is more reprehensible than an

individual instance of malfeasance."  *Gore*, 517 U.S. at 577, 116 S. Ct. at 1599.  Moreover, we

cannot say that Meyers' conduct resulted from "mere accident" rather than malice, particularly

when the jurors found that he committed the intentional torts of assault and battery on multiple

occasions spanning several months.  Meyers plainly demonstrated an "indifference to or a

reckless disregard of the health" and safety of Allam.  *Campbell*, 538 U.S. at 419, 123 S. Ct. at

1521.  Additionally, we may reasonably conclude that Allam was financially vulnerable during

the relevant time period because, according to her testimony, she was not authorized to work in

this country and had depleted her savings.  (Trial Tr. at 103–04, 123.)  In sum, each of these

aggravating factors support a finding of reprehensibility and the imposition of punitive damages.

　　　　The second guidepost addresses any disparity between the harm suffered by the plaintiff

and the punitive award, typically by comparing the compensatory and punitive awards.

*Campbell*, 538 U.S. at 418, 424–28, 123 S. Ct. at 1520, 1524–26.  By analyzing this factor, we

"ensure that the measure of punishment is both reasonable and proportionate."  *Id.* at 426–28,

123 S. Ct. at 1525–26; *see Payne*, 2012 WL 4513114, at *11; *Thomas v. iStar Fin., Inc.*, 508 F. Supp. 2d 252, 262–64 (S.D.N.Y. 2007).  Although the Supreme Court has repeatedly declined to "impose a bright-line ratio which a punitive damages award cannot exceed, [. . .] in practice, few awards exceeding a single-digit ratio between compensatory and punitive damages . . . will satisfy due process." *Campbell*, 538 U.S. at 424–28, 123 S. Ct. at 1520, 1524; *Payne*, 2012 WL 4513114, at *11; *Thomas*,  508 F. Supp. 2d at 263–64.  That being said, the reasonableness of the punitive damages award depends not only on the ratio but on the size of the compensatory award.  In other words, higher ratios may be appropriate to punish particularly egregious conduct that actually caused a relatively minimal amount of harm.  As the Supreme Court instructs, "[t]he converse is also true, however." *Campbell*, 538 U.S. at 425, 123 S. Ct. at 1524.  Where the jury awards substantial compensatory damages, for example, "then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *Id.*; *Payne*, 2012 WL 4513114, at *11; *Thomas*, 508 F. Supp. 2d at 263–64.

Here, the ratio of punitive to compensatory damages is 1.5 to 1.  This ratio, standing alone, does not raise any alarms.  But when we consider the size of the pain and suffering award, even this low ratio skirts the constitutional limit.  The $200,000 compensatory award in this case—though warranted—is undeniably substantial, particularly given the lack of severe or permanent physical injury to Allam.  *See Shukla v. Sharma*, No. 07 C 2972, 2012 WL 481796, at *15–16 (E.D.N.Y. Feb. 14, 2012) (finding 2.5:1 ratio excessive in light of $1 million compensatory award); *Thomas*, 508 F. Supp. 2d at 262–63 (finding that a ratio of between 3:1 and 4:1 was excessive in light of roughly $280,000 compensatory award in an employment matter).  Under these circumstances, a 1:1 ratio would more appropriately comport with due

process. *See Shukla*, 2012 WL 481796, at *15 (remitting punitive damages award to equal the substantial compensatory damages award); *Thomas*, 508 F. Supp. 2d at 263 (same).

Turning to the third guidepost, we compare the punitive damages award imposed here with any civil or criminal penalties imposed for comparable conduct, by legislative or legal action. *Campbell*, 538 U.S. at 428, 123 S. Ct. at 1526 (looking to both applicable civil or criminal penalties); *Payne*, 2012 WL 4513114, at *12–13 (considering New York criminal penalties, as well as prior damage awards); *Thomas*, 508 F. Supp. 2d at 263–64 (analyzing whether the award was in line with statutory caps on analagous claims as well as similar judicial awards). In doing so, we consider whether a tortfeasor received fair notice "that the wrongful conduct could entail a sizeable punitive damages award." *DiSorbo*, 343 F.3d at 187. We may turn to caselaw for useful guidance and must "accord substantial deference to legislative judgments concerning appropriate sanctions for the conduct at issue." *Gore*, 517 U.S. at 583, 116 S. Ct. at 1603.

Although we are not aware of state civil penalties applicable to Meyers' behavior, his actions constitute criminal conduct. Indeed, Meyers faced (or faces) criminal charges specifically for his October 17, 2009 attack on Allam. Based on our review of New York penal laws, Meyers' conduct—on several occasions—most likely supports prosecution for assault in the third degree, a Class A misdemeanor. N.Y. Penal Law § 120.00; *see Payne*, 2012 WL 4513114, at *12–13; *DiSorbo*, 343 F.3d at 187–88. Assault in the third degree covers both intentional or reckless conduct resulting in physical injury to another person, and is punishable by a prison sentence up to one year and a fine up to $1000. N.Y. Penal Law §§ 70.15, 80.05, 120.00; *Payne*, 2012 WL 4513114, at *12.

-27-

As the Second Circuit recently explained, New York's classification of such conduct as criminal supports the imposition of punitive damages, but "tells us little about the appropriateness of the amount of the award." *Payne*, 2012 WL 4513114, at *12. "[T]he law does not mandate either a prison sentence or a fine" for Class A misdemeanors. *Payne*, 2012 WL 4513114, at *12; *see* N.Y. Penal Law §§ 70.15, 80.05. State courts have complete discretion whether to impose jail time or a fine for assault in the third degree, which suggests that "New York regards this conduct as occupying the lower echelons of criminality." *Payne*, 2012 WL 4513114, at *12. While this criminal classification provided Meyers with some notice of potential sanctions, *id.*, it "gave little warning that the action could result in a [sizeable] punitive damages award," *DiSorbo*, 343 F.3d at 188 (noting that the potential for a $1000 fine did not put defendant on notice that he could face a $1.275 million punitive award).

In addition to the penal code, we consider punitive damages awards in comparable cases. As with compensatory awards, our review of punitive damages awards reveals a wide range of permitted verdicts based on the particular facts. In *Kroupova*, discussed earlier, the appellate division affirmed reduction of the punitive damages award against the bus driver from $1 million to $100,000, creating a 1:1 ratio with the remitted compensatory damages award. *Kroupova*, 242 A.D.2d at 218, 220–21, 661 N.Y.S.2d at 219, 220–21. In *Denman*, the court reduced the punitive damages award from $600,000 to $200,000, where the plaintiff received $50,000 in compensatory damages after being punched in the head by a customer. 2006 WL 452018, at *9. Consistent with the above authorities, the jury's $300,000 punitive damages award against Meyers is unreasonable and disproportionate to the harm suffered by Allam.

Taking all of the *Gore* factors into consideration, we conclude that a $200,000 punitive

damages award would suffice to punish Meyers and deter others, without overreaching.  This reduced award would set a more fair 1:1 ratio, balancing the reprehensibility of Meyers' repeated abuse with the already significant pain and suffering award.  The reduced award would also better comport with relevant caselaw, New York's assessment of this type of criminal conduct, and constitutional due process concerns.  *See, e.g.*, *Payne*, 2012 WL 4513114, at *7 (stating that "[e]ven if there is no such thing as a *correct* amount of punitive damages, . . . a legal system has an obligation to ensure that such awards for intangibles be fair, reasonable, predictable, and proportionate.").  Accordingly, Meyers' Rule 59 motion is granted in part.  We will order a new trial as to punitive damages only, unless Allam accepts the remittitur suggested here by December 14, 2012, such that her punitive damages award shall be reduced to $200,000.

**CONCLUSION**

For the reasons set forth above, we grant Meyers judgment as a matter of law pursuant to Rule 50 on Allam's IIED claim, which she failed to support at trial with required medical evidence of her emotional distress.  Should the Second Circuit disagree with that holding, we conditionally rule that Meyers would not be entitled to a new trial on the IIED claim.

We also grant Meyers' Rule 59 motion for a new trial in part.  As described above, we will schedule a new trial on punitive damages unless Allam stipulates to a reduction of the punitive damages award to $200,000 by December 14, 2012.

Meyers' motion is denied in all other respects.

SO ORDERED:

Marvin E. Aspen
United States District Judge

Dated:        Chicago, Illinois
              November 19, 2012